TECUMSEH PRODUCTS COMPANY,
Plaintiff,

v.

BRIGGS & STRATTON
CORPORATION,
Defendant.

No. 02–C–0334.

United States District Court,
E.D. Wisconsin.

Dec. 5, 2003.

Abigail M. Butler, David P. Irmscher, Baker & Daniels, James W. Mohr, Jr., Mohr & Anderson, Hartford, WI, for Plaintiff.

Casimir F. Laska, Jonathan H. Margolies, Katherine W. Schill, Michael Best & Friedrich, Milwaukee, WI, for Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CALLAHAN, United States Magistrate Judge.

### I. PROCEDURAL AND FACTUAL BACKGROUND

This is a patent infringement action. The plaintiff, Tecumseh Products Company ("Tecumseh"), alleges that the defendant, Briggs & Stratton Corporation ("Briggs"), is infringing Tecumseh's U.S. Design Patent No. 396,045 (the " '045 Patent") by manufacturing and selling Briggs' Aero/Quantum line of engines, and all similarly styled engines. Briggs has denied that its Aero engine infringes on the '045 Patent.

On April 21, 2003, this court issued its decision on claim construction of the '045 Patent. On May 7, 2003, the court issued a scheduling order under the terms of which, *inter alia,* all motions for summary judgment were to be filed no later than June 30, 2003. That schedule was subse-

quently modified at the parties' request to require any summary judgment motions be filed no later than July 14, 2003. In accordance with the scheduling order, on July 14, 2003, Briggs filed a motion for summary judgement, which has now been fully briefed by the parties and is ready for resolution.

In accordance with Civil Local Rule 56.1 and 56.2, Briggs filed a set of proposed findings of fact and conclusions of law, to which Tecumseh has responded. Likewise, Briggs has responded to Tecumseh's proposed findings. Upon review of the parties' respective proposed findings, the following are the material undisputed facts in this case. Additional facts that the court concludes to be undisputed will be discussed in the analysis portion of this decision.

Plaintiff Tecumseh Products Company ("Tecumseh") is a Michigan corporation having its principal place of business in Tecumseh, Michigan. Tecumseh is in the business of designing and manufacturing gasoline engines and power train components for lawn and garden applications. (Defendant's Proposed Findings of Fact and Conclusions of Law ("DPFOF") ¶ 1.)

Defendant Briggs & Stratton ("Briggs") is a Wisconsin corporation having its principal place of business in Wauwatosa, Wisconsin. Briggs is in the business of designing and manufacturing gasoline engines and power train components for lawn and garden applications. (DPFOF ¶ 2.)

Briggs sells the foregoing equipment in interstate commerce, and is a direct competitor of Tecumseh. (DPFOF ¶ 3.)

This action is based upon an alleged violation of the Patent Act, 35 U.S.C. § 1, et seq. As such, this Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 and 1338. (DPFOF ¶ 4.)

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c), and under 28 U.S.C. § 1400(b). (DPFOF ¶ 5.)

On December 1, 1995, Tecumseh filed a design patent application for the Centura engine, which issued as the '045 patent to Tecumseh, as the assignee from the inventor, Mr. Brian Neeley, on July 14, 1998. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 5 and DPFOF ¶ 6.)

A year earlier, over Labor Day weekend of 1997—while the application for the '045 patent was pending in the Patent and Trademark Office ("PTO")—Tecumseh representatives attending the annual trade show in Cologne, Germany saw a new engine being shown by Briggs & Stratton, i.e., the Aero, or Quantum XTS. (DPFOF ¶ 7.)

Tecumseh is not aware of a single customer who purchased the Briggs Aero believing it to be a Tecumseh Centura. (DPFOF ¶ 8.)

Tecumseh filed suit alleging infringement of the '045 patent on April 4, 2002.[1] This was approximately four and one-half years after Tecumseh first saw the Aero engine in Cologne and three and one-half years after the '045 patent issued. (DPFOF ¶ 9.)

In April, 2003, this Court issued its claim interpretation after reviewing the briefs submitted by both parties. (DPFOF ¶ 10.)

In its decision of April 21, 2003, this court interpreted the patent claim to be as follows:

The top of the engine, as shown in Figure 6, is generally symmetrical although

---

**1.** Although the defendant alleges that Tecumseh filed suit alleging infringement of the '045 patent in December, 2002, the court docket indicates that the suit was actually filed on April 4, 2002.

the outline is slightly irregular. The bib and shroud are visually centered from the top, front, and rear views. Horizontally centered on the top of the engine is a circular set of vents comprised of a single row of 30 triangular vents. Each triangular vent slants to the right, with the narrowest angle pointing to the center, creating a spiral or rotational effect within the centered circle. A T-shaped pull handle extends from the back of the circle at about the 11:00 position. The handle is symmetrical and looks like a capital letter T.

FIG. 6

The circular set of vents sits flat and is surrounded by a bib which lies atop a shroud, as shown in Figures 1 and 6. Like the circle, the bib and shroud are horizontally centered on the engine. The bib and shroud are both curved and slop downward toward the front.

FIG. 1

FIG. 6

As shown in Figures 1–4 and 6, the engine's gas tank is located on the left side and wraps around the back of the shroud. The gas tank has rounded corners, and a three-tiered lip that runs the full length of the tank. As seen most readily in Figure 4, the gas tank—like the bib and shroud—slopes downward toward the front of the engine.

FIG. 1  FIG. 2  FIG. 3  FIG. 4  FIG. 6

The gas cap is located to the right and rear of the engine, on the back right corner of the gas tank. The cap bears eight narrow vertical spines which extend from the bottom and curve over the cap's top edge. There are no other protrusions on the top of the cap. The oil cap is located adjacent the T-shaped pull handle, just inside the left rear corner on the gas tank. Like the gas cap, the oil cap bears eight narrow vertical spines which extend from the bottom and curve over the cap's top edge. Also like the gas cap, the oil cap has no other protrusions on its top.

FIG. 1  FIG. 3  FIG. 6  FIG. 7

The engine's air cleaner is located entirely on the right side as shown in Figure 1, 2, 3, 5, 6 and 7. The air cleaner extends about 2/3 the length of the engine and has rounded corners and a single lip running its entire length.

The muffler, as shown in Figures 1, 2, 5, 6 and 7, is located in front of the air cleaner on the engine's right side. It has a generally dog-legged shape. Five rows of holes, staggered with respect to each other, are located on the lower portion of the muffler.

As shown in Figure 2, the '045 patent claims a set of approximately 18 fins, visually centered in the front of the engine, bolted onto the shroud with two bolts visible on the exterior of the shroud. The outline of the cooling fins structure is rectangular but asymmetrical. The left side bottom is far more rounded than the right. The cooling fins on the right extend as far down as the muffler immediately to the right of it. There are a total of seven bolts, with the bolts visible on the exterior of the bib being smaller than the bolts on the fins.

FIG. 2

(Order of 4/21/03, at App. 1–6.)

All of the features described above are contained within unbroken lines in the drawings and are primarily ornamental because their appearance is not dictated by the function they serve. (DPFOF ¶ 20.)

## II. STANDARDS

### A. SUMMARY JUDGMENT

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed. R.Civ.P. 56(e) (quoted in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The standard governing summary judgment is clear: 'If no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment ... then summary judgment *must* be granted.'" *Oates v. Discovery Zone*, 116 F.3d 1161, 1175 (7th Cir. 1997) (quoting *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 660 (7th Cir.1991)) (emphasis added).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Reid v. Norfolk & Western Ry. Co.*, 157 F.3d 1106, 1110 (7th Cir.1998). "To state it differently, a party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997) (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See DiGiore v. Ryan*, 172 F.3d 454, 460 (7th Cir.1999). " 'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.' " *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir.1999) (quoting *Smith*, 129 F.3d at 425). "However, neither 'the mere existence of some alleged factual dispute between the parties,' nor

the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat such a motion." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (citations omitted).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## B. DESIGN PATENT INFRINGEMENT

■ Unlike a utility patent, which is defined by a series of numbered claims, a design patent has only one claim which is defined by the accompanying figures. "Whether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed.Cir. 1997). The responsibility of construing the claim belongs to the court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 997 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■ "A design patent only protects the novel, ornamental features of the patented design." *OddzOn*, 122 F.3d at 1405. "In construing a design patent claim, the scope of the claimed design encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.' " *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir.2002) (quoting *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 104–05 (Fed. Cir.1996)). Indeed, "all of the ornamental features illustrated in the figures [of the patent] must be considered in evaluating design patent infringement. This is because '[a] patented design is defined by the drawings in the patent, not just by one feature of the claimed design.' " *Contessa*, 282 F.3d at 1378 (quoting *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed.Cir.1993)).

■ Furthermore, "[i]f features appearing in the figures are not desired to be claimed, the patentee is permitted to show the features in broken lines to exclude those features from the claimed design, and the failure to do so signals inclusion of the features in the claimed design." *Contessa*, 282 F.3d at 1378. In determining whether certain aspects of the drawings in the patent reflect ornamental as opposed to utilitarian purpose, the court is guided by the following principle: "A design patent is directed to the appearance of an article of manufacture. An article of manufacture necessarily serves a utilitarian purpose, and the design of a useful article is deemed to be functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article. If the particular design is essential to the use of the article, it can not be the subject of a design patent." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir.1993) (citations omitted).

■ "Although the design patent is directed to the ornamental aspect of a useful article, that the design of a particular article is related to the article's use may not defeat patentability. When the design is primarily ornamental, although it serves a utilitarian purpose, this design patent condition is met.... [T]o qualify for design patent protection, a design must have an ornamental appearance that is not dictated by function alone." *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed.Cir.1997). In *Hupp*, the court went on to further describe how a court should

go about determining whether a feature is ornamental rather than utilitarian:

> In determining whether the statutory requirement is met that the design is "ornamental," it is relevant whether functional considerations demand only this particular design or whether other designs could be used, such that the choice of design is made for primarily aesthetic, non-functional purposes. *L.A. Gear v. Thom McAn*, 988 F.2d at 1123–24, 25 U.S.P.Q.2d (BNA) at 1917 ("When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose."). *In re Carletti*, 51 C.C.P.A. 1094, 328 F.2d 1020, 1022, 140 U.S.P.Q. (BNA) 653, 654 (Cust. & Pat.App.1964) (determining whether the appearance is "directed by" the use of the article).

*Hupp*, 122 F.3d at 1460–61.

As previously stated, on April 21, 2003, this court issued its decision on claim construction of the '045 Patent. Thus, it now becomes necessary to perform the second step of the patent infringement analysis, i.e., compare the construed claim to the accused device (the Aero engine) under the "ordinary observer" test. *OddzOn*, 122 F.3d at 1404–05. This test asks "whether the patented design as a whole is substantially similar in appearance to the accused design" from the perspective of an ordinary observer. *Id.* at 1405. "It is the appearance of a design as a whole which is controlling in determining infringement. There can be no infringement based on the similarity of specific features if the overall appearance of the designs are dissimilar." *Id.*

Furthermore, in *Contessa* the court held:

> Our precedent makes clear that all of the ornamental features illustrated in the figures must be considered in evaluating design patent infringement. This

is because "[a] patented design is defined by the drawings in the patent, not just by one feature of the claimed design." *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450, 27 U.S.P.Q.2d (BNA) 1297, 1302 (Fed.Cir.1993). In particular, in the "ordinary observer" analysis, the patented design is viewed in its entirety, as it is claimed. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1125, 25 U.S.P.Q.2d (BNA) 1913, 1918 (Fed.Cir. 1993). If features appearing in the figures are not desired to be claimed, the patentee is permitted to show the features in broken lines to exclude those features from the claimed design, and the failure to do so signals inclusion of the features in the claimed design. *Door–Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313, 59 U.S.P.Q.2d (BNA) 1472, 1475 (Fed.Cir.2001).

*Contessa*, 282 F.3d at 1378. Such being the case, "the 'ordinary observer' analysis is not limited to the ornamental features of a subset of the drawings, but instead must encompass the claimed ornamental features of all figures of a design patent." *Id.* at 1379.

In the end, the issue is whether, to an ordinary observer, "giving such attention as a purchaser usually gives," the designs "are substantially the same ... such as to deceive such an observer, inducing him to purchase one supposing it to be the other." *Gorham Co. v. White*, 81 U.S. 511, 528, 14 Wall. 511, 20 L.Ed. 731 (1871). However, in applying such test, the court in *Contessa* made clear that it is not just the point of purchase that is to be considered in determining whether an ordinary observer would be deceived.

> [F]or purposes of design patent infringement, the "ordinary observer" analysis is not limited to those features visible during only one phase or portion of the

normal use lifetime of an accused product. Instead, the comparison must extend to all ornamental features visible during normal use of the product, i.e., "beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of the article."

*Contessa,* 282 F.3d at 1380 (citation omitted) (quoting *In re Webb,* 916 F.2d 1553, 1557–58 (Fed.Cir.1990)).

■ Moreover, even if the patented design is deemed to be substantially similar to the accused device under the ordinary observer test, the infringement analysis is not over. If the ordinary observer analysis leads to the conclusion that the two designs are substantially similar, then the designs must again be compared to determine whether the accused design "appropriates the novelty which distinguishes the patented design from the prior art." *Contessa,* 282 F.3d at 1377 (citing *Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed.Cir.1984)). However, "[a]lthough application of the 'ordinary observer' and 'point of novelty' tests may sometimes lead to the same result, it is legal error to merge the two tests, for example by relying on the claimed overall design as the point of novelty." *Contessa,* 282 F.3d at 1377 (citation omitted).

## III.  DISCUSSION AND ANALYSIS

■ Summary judgment is appropriate in a patent infringement case. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1561 (Fed.Cir. 1988) ("It is no longer debatable that the issues in a patent case are subject to summary judgment."). Ultimately, the burden is on the plaintiff, Tecumseh, to prove by a preponderance of the evidence that Briggs' Aero engine infringes on its '045 design patent. *See Sun Hill Indus., Inc. v. Easter Unlimited, Inc.,* 48 F.3d 1193, 1196 (Fed.Cir.1995); *see also L.A. Gear, Inc.,* 988 F.2d at 1124 ("Design patent infringe-

ment is a question of fact, to be proven by a preponderance of the evidence."). More particularly, Tecumseh bears the burden of proving, by a preponderance of the evidence, that (1) the Aero engine is substantially similar in appearance to the overall patented design, as construed by this court and shown in the patent figures, and (2) that the Aero engine appropriated the point of novelty that distinguishes the '045 design from the prior art. If Tecumseh fails to demonstrate that there is material issue of fact surrounding its claim that Briggs's Aero engine infringes the '045 design patent, summary judgment must be granted to Briggs. This is because "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Conversely, Briggs may not be granted summary judgment if, when viewed in the light most favorable to Tecumseh, "there is evidence creating genuine issues of material fact and upon which the jury could reasonably find infringement." *ADC Telecommunications., Inc. v. Panduit Corp.,* 200 F.Supp.2d 1022, 1034 (D.Minn.2002).

Briggs argues that comparison of the '045 patent as construed by the court to the Aero design compels the conclusion that no substantial similarity exists. More particularly, Briggs asserts that there are numerous differences between the two. They include, *inter alia,* the following.

First, "the Aero design does not have a 'circular set of vents comprised of a single row of 30 triangular vents … creating a spiral or rotational effect within the centered circle.' (Markman Order, App. 1) Rather, the vents in the Aero's recoil cover

are in a horseshoe shape, and are not centered on the top of the engine as are the '045 vents." (Def.'s Br. at 7.)

Second, "the ornamental aspects of the respective gas tanks are substantially different in design. In the '045 design, the gas tank extends the full length of the engine on the left side when viewed from the front, and then wraps all the way around the back and about 1/3 the length of the engine's right side. . . . In the Aero design, by contrast, the gas tank is located across the back of the engine, and reaches only about 1/3 of the left length of the engine." (Def.'s Br. at 8.)

Third, "[i]n the '045 design, the air cleaner is located along the right side of the engine, directly above and behind the muffler, and extends about 2/3 the engine's length. In the Aero design, the air cleaner forms the front left corner of the engine and sits directly in front of the gas tank." (Def.'s Br. at 9.)

Fourth, "[t]he muffler in the '045 design has a dogleg shape and five rows of staggered holes at the lower portion. In the Aero design, the muffler extends from the front about 2/3 of the engine's length, has a tapered rectangular shape and holes within the circumference of a circle." (Def.'s Br. at 10.)

The final difference between the two designs is that,

the ornamental features of the tops of the engines—including the bib and shroud, which Tecumseh consistently calls the "focal point" of the design—create substantially different impressions. The top of the '045 engine design is generally symmetrical, while the Aero design is generally asymmetrical. The bib of the '045 patent is an oval with a fair degree of height, and is centered on the shroud. In the Aero design, the recoil cover has an irregular shape and is much flatter. Additionally, the Aero's

shroud is significantly more visible that the '045 shroud . . .

(Def.'s Br. at 10.)

In response, Tecumseh presents several arguments in support of its position that there are triable issues of material fact that preclude summary judgment. First, Tecumseh argues that,

in the present case, only a retail purchaser of lawnmowers can be the proper *Gorham* 'ordinary observer.'

. . . Briggs has not properly considered or presented evidence regarding the overall visual appearance of the design of the '045 patent in view of the Aero engine *from the viewpoint of the ordinary observer,* as is proper under *Gorham.* Rather, Briggs attempts to establish dissimilarity by setting forth only attorney argument and custom-colored photos, in which specific differences between the '045 design and the Aero engine are dissected in a side-by-side comparison. Briggs has ignored the conceptual framework of the *Gorham* test, which employs the viewpoint of an ordinary observer in the context of a purchasing decision, giving the attention which an ordinary purchaser usually gives—a conceptual framework particularly suited for resolution by a jury, and not by attorney argument. . . .

Under *Gorham,* the focus is on the overall ornamental appearance of the claimed design, and not on selected ornamental features. . . . [A]lthough the claim of the '045 patent is the ornamental features as construed by the Court, it is the *overall appearance* or *overall impression* of those ornamental features on the ordinary purchaser which is the basis for determining substantial similarity under *Gorham.*

(Pl.'s Br. at 8–10 (emphasis in original).) Furthermore, Tecumseh argues that Briggs has not produced any expert testi-

mony to support its argument of dissimilarity. Thus, because Tecumseh's expert opinion is unrebutted, the case must go to the jury. More particularly, Tecumseh asserts:

Tecumseh has presented expert opinion evidence of substantial similarity between the designs of the '045 patent and the Aero engine which ... is based upon the ornamental features in all of the views of the '045 patent, as those would be viewed by the ordinary observer, giving the attention an ordinary purchaser would normally give when making a purchasing decision. Thus, a triable issue of fact exists as to whether an ordinary observer would find the designs of the '045 patent and the Aero engine to be substantially the same.

(Pl.'s Br. at 12.)

In reply, Briggs argues that Tecumseh, at least in part, has misstated the proper test to be used for determining whether a design patent has been infringed. According to Briggs, it is *not* merely the time of purchase that is to be considered in deciding whether an ordinary observer would find two designs to be substantially similar to one another. Instead, it is the entire normal use life of the product that is to be considered in applying the ordinary observer test.

On this particular point, Briggs is correct. In *Contessa* the court stated:

Thus, we hold that the "ordinary observer" analysis is not limited to those features visible at the point of sale, but instead must encompass all ornamental factures visible at any time during normal use of the product.

.    .    .    .    .

The failure of the district court to consider the implications of the ornamental features visible during normal use, including the ornamental features of all Figures of the '612 patent, in comparison to the corresponding features of the

accused products necessitates that we vacate the district court's summary judgment of infringement and remand the case to the district court for further consideration.

*Contessa*, 282 F.3d at 1381. The district court in *Contessa* had erred in failing to include in its infringement analysis the *underside* of the patented shrimp tray design in that case. Instead, the district court had limited its analysis to those features of the tray visible at the point of sale. Because the underside of tray was not visible at the point of sale, the district court found consideration of that part of the tray unnecessary in the infringement analysis.

In finding that the district court had not performed a proper infringement analysis, the Federal Circuit Court of Appeals noted that the patented design of the shrimp tray had included the underside thereof. This is because the figures submitted in support of the patent application had not illustrated that part of the tray "in broken lines to exclude those features from the claimed design." *Contessa*, 282 F.3d at 1378 (citing *Door–Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313 (Fed.Cir. 2001)). Accordingly, the underside of the tray (even though it may not have been visible to the purchaser at the point of sale) had to be considered in deciding whether the patented design and the accused design would be viewed by an ordinary observer to be substantially similar to one another. The court stated:

In this case, the normal use of the accused product extends beyond the time of purchase. The serving tray with shrimp sold by Conagra is intended to be purchased by consumers who remove the packaging obscuring the underside of the tray prior to consuming the shrimp. Because the underside of the tray is fully revealed when the packag-

ing is removed and thereafter is visible to the consumer during use of the accused product, it was error for the district court to discount and overlook Figure 4 of the '612 patent, illustrating the underside of the tray.

*Contessa*, 282 F.3d at 1381.

As stated previously, Tecumseh argues that the court must deny Briggs' motion for summary judgment because Briggs has not produced an expert opinion to rebut that offered by Tecumseh. It is true that Briggs has not produced any expert opinion testimony in support of its motion. However, Tecumseh's argument on this point rings rather hollow because Tecumseh's expert, Professor Hammond, applied the wrong test in reaching his opinion on the substantial similarity of the Aero engine design and the '045 patent. More precisely, Professor Hammond centered his attention on what an ordinary observer would consider *at the time of retail purchase* of a lawnmower on which one of the two engines was placed. Tecumseh describes such testimony as follows:

> Although Professor Hammond has considered *all* of the views of the '045 patent consistent with the Federal Circuit's recent ruling in *Contessa*, Professor Hammond notes that the determination of substantial similarity under *Gorham* must necessarily be tempered by the reality that the purchaser of a lawnmower considers other factors than the appearance of the engine in making a purchasing decision, such as the overall designs of the lawnmowers, the brand names of the lawnmowers, the prices of the lawnmowers, the power of the engines, and other features of the lawnmowers. (¶ 7, Hammond Decl.). Further, at the retail location, the ordinary observer would typically see the lawnmowers arranged on the floor, and would primarily view the engines from the downwardly-looking front perspective, without considering the other

views in as much detail. (¶¶ 9–12, Hammond Decl.). Finally, because the engine would be attached to the deck of the lawnmower, the ordinary purchaser would not be able to see the bottom view at all, and the back view would likely be obscured by the mower bag. (¶¶ 10, 11, Hammond Decl.).

> Considering these practical factors is not, as Briggs would certainly argue, an attempt to focus only on certain features of the design of the '045 patent to the exclusion of others. Rather, it is a proper application of the *Gorham* test, a fact-based conceptual framework of an ordinary observer making a purchasing decision, considering the overall visual impression of the engines, and giving such attention as a purchaser would normally give.

(Pl.s' Br. at 13.) This is not a proper application of the *Contessa* ordinary observer test. As noted above, the *Contessa* court made clear that in determining whether an accused design infringes on a patented design the court is to consider "all ornamental features visible at any time during normal use of the product," not just those visible to a retail purchaser at the time of purchase. *Contessa*, 282 F.3d at 1381. "[N]othing in *Gorham* restricts the comparison between the patented design and the accused product to features visible at the point of purchase. Rather than limiting the assessment of infringement to the point of purchase, the *Gorham* test applies an objective frame of reference, the hypothetical purchasing decision to be made by an ordinary observer, to all ornamental features *visible at any time during the normal use of a product.*" *Id.* (emphasis added). Such being the case, the expert testimony offered by Tecumseh is accorded limited, if any, weight on this issue.

Furthermore, in rendering his opinion on the question of similarity, Professor

Hammond opines, *inter alia,* that "in viewing lawnmower engines, the ordinary purchaser would focus primarily, if not exclusively, on the overall visual impression created by the engine, and would not focus upon particular features of the engine which are common to all internal combustion engines, such as the muffler, spark plug, recoil handle pull, gas and oil caps and air cleaner, for example." (Hammond Decl. ¶ 13.) He then proceeds to examine and discuss the various ornamental features of the Aero and Tecumseh Centura engines. In the process of doing so, however, he seems to disregard certain ornamental features of the Centura engine (as contained within the figures of the patent) as being insignificant and therefore not worthy of consideration in his infringement analysis.

For example, he states that in his view "the specific configuration and arrangement of the vents, which is somewhat different between the '045 patent and the Aero engine, is not a feature which would be readily appreciated by the ordinary observer." (Hammond Decl. ¶ 17.) He asserts that "[t]he Aero engine includes an air cleaner on [the right side] of the engine which is not present in the Centura engine; however, it is my opinion that this difference would not merit substantial attention from the ordinary purchaser, given the time in which an ordinary purchaser would make a purchasing decision." (Hammond Decl. ¶ 19.) Further, he states that "[w]hile the muffler is visible toward the front portion of the engine beneath the shroud, and most of the engine block is visible beneath the shroud, these features would not affect the ordinary observer's overall impression of the designs." (Hammond Decl. ¶ 20.)

Simply stated, the value of Professor Hammond's opinion on similarity is suspect because it appears to be premised, at least in part, on the proposition that some of the ornamental features that are contained in the patented design would not be important to the ordinary retail purchasers of lawnmowers. That Professor Hammond may think certain ornamental features of the patented design would be unimportant to a retail purchaser is of no moment in this case.

To begin, and as noted above, it is not the view of an ordinary retail purchaser at the time of purchase that is to be considered in applying the "ordinary observer" test. The "ordinary observer" test transcends the view of the ordinary retail purchaser at the time of purchase. Moreover, although Professor Hammond may feel free to disregard the importance of certain ornamental features of the patented design in rendering his opinions, this court cannot disregard any of the ornamental features found in the figures accompanying the patent, so long as they were not drawn in broken lines. To reiterate, "[i]f features appearing in the figures are not desired to be claimed, the patentee is permitted to show the features in broken lines to exclude those features from the claimed design, and the failure to do so signals inclusion of the features in the claimed design." *Contessa,* 282 F.3d at 1378.

Finally, expert testimony is not a *sine qua non* to this court's being able to apply the "ordinary observer" test. Nor is it essential that there be expert testimony in order for the court to decide whether there are material issues of fact that preclude summary judgment in a case such as this. "[W]hether the patented design and the accused product are 'substantially the same' is to be determined from the viewpoint of 'the eyes of men of generally, of observers of ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which men of ordinary intelligence give.' Analysis under the

'ordinary observer' test is to be conducted with the 'ordinary observer' and not the expert designer in mind." *Contessa,* 282 F.3d at 1381–82 (citation omitted); *see also Hosley International Trading Corp. v. K Mart Corp.,* 237 F.Supp.2d 907, 911 (N.D.Ill.2002) ("*Gorham* does not prohibit a trier of fact from relying exclusively or primarily on a visual comparison of the patented design and the accused device's design in finding design patent infringement.").[2]

To be sure, there are similarities between the design of the two engines, most particularly, the bib and shroud, and the sloping-forward nature of the front of the bib and shroud. But the design of the '045 patent includes much more than the bib and shroud. The design also includes particular features of other parts of the engine, including the shape of the vents in the recoil cover and their arrangement thereon, the shape and location of the gas tank, the shape and location of the air filter, and the shape and location of the muffler. Because these particular features are included in the patented design and because these particular features (like the bib and shroud) would be visible at some time during the normal use of the Aero engine, the court must consider them in assessing "'if the resemblance [at such point] is such as to deceive ... an ordinary observer, giving such attention as a purchaser usually gives, ... inducing him to purchase one supposing it to be the other.'" *Contessa,* 282 F.3d at 1381 (quoting *Gorham,* 81 U.S. at 528, 14 Wall. 511).

Bearing all of the foregoing in mind, and upon applying the "ordinary observer" test, it is my opinion that no reasonable jury could find that Briggs' Aero engine infringes the '045 design patent. This is for the simple reason that, when one considers all of the Aero engine's ornamental features visible at any time during normal use of the Aero engine, and compares the same to all of the ornamental features illustrated in the drawings of the '045 patent (and thereby made a part of the patented design), the "patented design as a whole is [not] substantially similar in appearance to the accused design [of the Aero engine]." *See OddzOn,* 122 F.3d at 1405. Stated another way, a visual comparison of the Aero engine and the '045 patent designed engine reveals that the overall look of the two products is too dissimilar to support a finding of infringement of the '045 design patent.

Set forth immediately below is an overhead view of the two engines. The Centura engine (figure 6) is on the left and the Aero is on the right. Unlike the Centura engine which has a "circular set of vents comprised of a single row of 30 triangular vents ... creating a spiral or rotational

---

2. Tecumseh has also submitted the sworn Declaration of Attorney Thomas E. Smith in opposition to Briggs' motion for summary judgment. However, the text of Attorney Smith's sworn declaration is directed principally to the issue of willfulness. For reasons which follow in this decision and order, the court finds it unnecessary to address that issue.

Moreover, to the extent that Attorney Smith's expert report (which is referenced in the Attorney Smith's sworn declaration) is relied upon by Tecumseh to show that there is a genuine issue of material fact which precludes summary judgment on the issue of infringement, such reliance is misplaced. Briggs argues at page 13 of its brief that (1) Attorney Smith's opinion is wholly conclusory, (2) that his "opinion fails to establish a link between the ornamental features which this Court has held comprise the patented design, and his conclusion that the Aero design is substantially similar to the '045 design," and (3) that his opinion "fails to consider *all* the ornamental features illustrated in the patent." (Def.'s Br. at 13 (emphasis in original).) I agree. Thus, Attorney Smith's opinion would in any event be insufficient to support a jury verdict in favor of Tecumseh. *See OddzOn,* 122 F.3d at 1404.

effect within the centered circle" (Order of 4/21/03, at App. 1), the vents in the Aero's recoil cover are in a horseshoe shape, are in a double row, and are not centered on the top of the engine as are the '045 vents.

Set forth immediately below are views of the gas tanks of each engine. The Centura engine, i.e., the patented design (figures 1, 3, 4 and 6), is on the left. The Aero engine is on the right. The gas tank on the Centura engine (which is highlighted) extends the full length of the engine on the left side (as viewed from the front of the engine) and wraps all the way around the back and about 1/3 the length of the engine's right side. It also includes a three-tiered lip at the midpoint, a general downward slope which matches the slope of the bib and shroud, and soft, rounded corners. By contrast, the gas tank on the Acro engine is located across the back of the engine, and reaches only about 1/3 of the left length of the engine (as viewed from the front of the engine). The corners are more angular than the corners of the Centura's gas tank, and the tank's lip is single tiered and located in the upper 1/3 of the tank.

FIG. 1

FIG. 3

FIG. 4

FIG. 6

Set forth immediately below are views of the air cleaners of each engine. The Centura engine (figures 5 and 6) is on the left. The Aero engine is on the right. On the Centura engine the air cleaner (which is highlighted) is located along the right side of the engine (as viewed from the front of the engine), directly above and behind the muffler, and extends about 2/3 the engine's length. On the Aero engine, the air cleaner forms the front left corner of the engine

(as viewed from the front of the engine) and sits directly in front of the gas tank.

Set forth immediately below are views of the mufflers of each engine. The Centura engine (figure 5) is on the left. The Aero engine is on the right. On the Centura engine the muffler (which is highlighted) is on the right side of the engine (as seen from the front), has a dogleg shape and five rows of staggered holes at the lower portion. On the Aero engine the muffler is likewise on the right side of the engine. However, it extends from the front about 2/3 of the engine's length, has a tapered rectangular shape and holes within the circumference of a circle.

FIG. 5

To be sure, it is "the overall appearance of the article," *L.A. Gear, Inc.,* 988 F.2d at 1123, that must be considered in determining infringement. However, in assessing the overall appearance of the article (in this case, an internal combustion engine), the ornamental features of the various external components of the engine cannot be ignored. After all, it is the ornamental features of the external components of an engine that an ordinary observer would notice when viewing the engine throughout its useful life. And it is the ornamental features of an engine's external components that, at least as they meet the eye, distinguish one engine from another.

In this case, Tecumseh included (with precision) in the '045 patent the above-described ornamental features of the various external components of the Centura engine. Because Tecumseh did so, those same precisely-drawn ornamental features of the various external components must be considered in determining whether a reasonable trier of fact, bearing in mind

the ornamental features of the Aero's external components, could find the Aero's overall appearance to be substantially similar to the patented design. To reiterate, "the 'ordinary observer' test requires consideration of *all* of the ornamental features illustrated in the figures of the design patent." *Hosley International Trading Corp.*, 237 F.Supp.2d at 910 (emphasis in original). Bearing in mind the precisely-drawn ornamental features of the above-described external components of the engine depicted in the '045 patent, and comparing the overall appearance of the patented design to the design of the Aero engine, the court concludes that no reasonable trier of fact could find the design of the Aero to infringe on the '045 patent. Simply stated, and as more particularly described above, there are far too many differences between the ornamental features of the various external components of each engine to support a finding of infringement.

Because the court concludes that no reasonable trier of fact could find the two designs to be substantially similar to one another under the ordinary observer test, it is not necessary to address the second step of the infringement analysis, i.e., whether the accused design "appropriates the novelty which distinguishes the patented design from the prior art." *Contessa*, 282 F.3d at 1377. Furthermore, the court's ruling of non-infringement renders it unnecessary to address Tecumseh's claim that Briggs' infringement of the '045 patent was willful.

In conclusion, and for all of the foregoing reasons, the court finds that the Aero design does not infringe on the '045 patent. Consequently, Briggs' motion for summary judgment will be granted and this action will be dismissed.

**NOW THEREFORE IT IS ORDERED** that defendant Briggs' motion for

summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.